SEAMAN *v.* RINDGE, KALMBACH, LOGIE & CO.

1. MORTGAGES—CONTRACTS—TRIAL—INSTRUCTIONS.
   In an action by the assignee of the interest of a mort-
   gagor in a fire insurance policy on a stock of merchandise
   for breach of an alleged contract made by insured with
   defendant's authorized attorney, that it would take out
   a policy of insurance which would also protect the interest
   of the mortgagor as well as that of other creditors, for
   whom defendant was trustee, *held*, that an instruction
   that if the attorney had no authority to make such agree-
   ment then it must appear that defendant, or some one
   acting for it, afterwards consented to the agreement and
   took out the policy to protect his interest as well as
   their own, was misleading.

2. SAME—CONTRACTS—CONSIDERATION.
   A contract between a mortgagor of a stock of merchandise
   and an attorney for the trustee for creditors for the
   taking out of a policy of insurance by the trustee which
   would protect the interest of the mortgagor, at the time
   a new mortgage was given for a larger sum than originally
   given, was based upon a sufficient consideration.

3. SAME—EVIDENCE—PAROL EVIDENCE—WRITTEN CONTRACT—ORAL
   CONTRACT TO INSURE.
   Where a mortgage on a stock of goods provided that the
   mortgagor should keep the interest of the mortgagee in
   the goods insured against loss by fire and that in default,
   within a specified time, it would be lawful for the mort-
   gagee to effect such insurance and the premium paid
   should be a lien added to the amount secured, *held*, that
   an oral contract that the mortgagee should take out a
   policy of insurance to protect the mortgagor's interest as
   well as that of the mortgagee, was not void as changing
   the terms of the mortgage by oral testimony.

4. DAMAGES—BREACH OF CONTRACT—MORTGAGES—NOTICE—DUTY TO
   LESSEN DAMAGES.
   Where the owner of a mortgaged stock of merchandise
   was informed of the breach of an agreement by a trustee
   for creditors, who was also a mortgagee, to insure for
       195 Mich.—27.

the owner as well as for such trustee a sufficient time before a fire to attend to it himself, it was his duty to do so, and in such case the measure of damages is not the loss resulting from a subsequent fire, but the value of the policy at the time the failure to insure was discovered.

5. MORTGAGES—BREACH OF CONTRACT TO INSURE—DAMAGES—EVIDENCE.

In an action by the assignees of the owner of a stock of goods to recover damages for an alleged breach of a contract by a trustee for creditors to insure for the owner, as well as for the trustee, said goods, upon which defendant held a chattel mortgage and policy of insurance as trustee for creditors, evidence *held*, insufficient to show that the goods destroyed exceeded in value the owner's indebtedness to the trustee.

Error to Kent; McDonald, J. Submitted October 25, 1916. (Docket No. 108.) Decided March 30, 1917.

Assumpsit by Rudolph Seaman and another, as assignees of Elmer P. Forbes, against Rindge, Kalmbach, Logie & Company, Limited, for breach of contract. Judgment for plaintiffs. Defendant brings error. Reversed.

*Corwin & Souter*, for appellant.

*Smedley & Linsey*, for appellees.

STEERE, J. Plantiffs brought this action as assignees of Elmer P. Forbes to recover damages for an alleged breach of a contract by defendant to insure for Forbes as well as itself his stock of merchandise at Chippewa Lake, Mich., upon which defendant held a chattel mortgage and policy of insurance as trustee for certain creditors. Plaintiffs, who are relatives of Forbes, were not witnesses in the case, and apparently had no personal knowledge of the transactions involved. Their declaration alleges, and it is not denied, that Forbes assigned to them "all his right, title, and

interest in and to said policy of insurance and all his right of action herein set forth against said defendant."

On July 17, 1912, Forbes, who resided at Chippewa Lake, Mich., was engaged, amongst other activities, in running a general store of limited capacity, and had become indebted in an amount slightly exceeding $1,-400 to Rindge, Kalmbach, Logie & Co., the Grand Rapids Dry Goods Company, and the Judson Grocery Company. Lester J. Rindge held, as trustee for the benefit of these three creditors, a $1,000 chattel mortgage covering Forbes' stock of merchandise and fixtures. The condition of his accounts was such that the creditors were dissatisfied, and Mr. Stanton, of the Judson Grocery Company, after consultation with Rindge, engaged the services of the attorney who had usually looked after the Judson Grocery Company's collections, but in this action appeared as attorney and witness for plaintiffs, to visit Chippewa Lake and, as he testifies, "look the situation over and get more security if I could." He did so, and obtained from Forbes a new chattel mortgage for $1,407.75, dated July 17, 1912, in the place of the former one, running to Rindge as trustee, which, among other things, provided that the mortgagor should—

"keep the interest of the parties of the second part in said goods and chattels insured against loss or damage by fire, and in default thereof, within ten days, it shall be lawful for said second party to effect such insurance and the premium so paid shall be a lien added to the amount secured hereby and payable forthwith."

At the time this mortgage was executed the stock was insured for $2,500 and they had some talk about insurance. The attorney states that he told Forbes—

"the chances are that these agents up here, as quick as they learn of the chattel mortgage, will cancel the policy. * * * If they cancel the insurance, let us

know, and we will take out insurance down there,"
etc.

Forbes testified that the attorney said:

"If there was any objection to the policy,   *   *   *
he would have it insured down at Grand Rapids.   *
*   *. I should see that these companies were informed
of the mortgage, and if there was any objection, that
I should inform him of it.   *   *   *   I understood it
was to be made out the same as they had always been."

On his return to Grand Rapids the attorney made
a report on Forbes' financial condition and prospects,
and of securing the new chattel mortgage, but not in
regard to any assurances or understanding between
himself and Forbes as to insurance beyond what ap-
peared in the mortgage.  He stated that he "had quite
a struggle" to get his clients to accept this mortgage
and extend the time of payment for a year.  Mr. Stan-
ton, who had been the active party in sending the
attorney to Chippewa Lake, then called up Mr. Rowe,
an insurance agent of Grand Rapids, with instruc-
tions "to protect him," and directed Rowe to call up
the attorney for particulars.  Mr. Rowe testified that
he did so, and obtained from the attorney a descrip-
tion of the property and the name of the party to
whom the policy was to be issued.  The policy, dated
July 20, 1912, was for $2,500, and ran to Rindge as
trustee for the three named creditors.  It was re-
newed the following year in the same form, except
that the trustee was changed to defendant, owing to
the intervening death of Mr. Rindge, which occurred
May 15, 1913.  These policies, each for the term of
one year, also contained an "iron safe clause" requir-
ing insured to take an inventory and keep books and
keep the same in the safe when the store was not open
for business.  On the same date the attorney wrote
Forbes, saying, amongst other things:

"We don't like to be without insurance, and there-

fore we have insured your stock and fixtures here in this city for $2,500. As soon as you get policies send them to us and we will cancel those that we have taken out. In the meantime you as well as the creditors are protected."

He had not seen this policy, and was not informed of its provisions beyond what he might infer from the particulars he gave Rowe. On July 23d Forbes answered the letter, thanking the attorney for placing him "on a solid footing," and two days later wrote that the local agent refused to carry his insurance. Neither Stanton nor Rindge had authorized the attorney to give such assurances, or knew of the correspondence until after the attorney was employed by Forbes, or his assignees. Forbes was required to and ultimately did pay the premium on this insurance, although he allowed his check for the same to be protested for nonpayment. He states that he never wrote Mr. Rindge about the insurance of his stock of merchandise.

In the spring of 1913 the condition of Forbes' indebtedness, credit, and stock of merchandise was such that these creditors were unwilling to carry him longer on the stock alone as security, and a real estate mortgage on his store building was added. The chattel mortgage was renewed for another year when it fell due, in the name of defendant as trustee in the place of L. J. Rindge, trustee, then deceased. The insurance was also renewed for another year with the name of the insured also changed from Rindge, trustee, to defendant as trustee. These policies were to the trustee as though owner, and made no mention of Forbes. After the death of Lester J. Rindge, who had acted as trustee, his son, Harry C. Rindge, had charge of credits and collections for their firm. He wrote Forbes a number of letters urging him to make payments on his mortgage, amongst other things to take care of the premium for insurance on his real estate, which

Rindge had placed for him, and stating the amount of the same. This Forbes acknowledged, expressing gratification that Rindge had "succeeded in getting" it and promising to send the money for it as soon as he could possibly spare it. He, however, was unable to keep up his payments as they came due, and increased his indebtedness until finally further credit was denied him. He testified of this:

"I was buying in small lots most assuredly. I know I was hard up, and small checks went to protest."

As early as June 19, 1913, he wrote to Stanton complaining:

"I have to send the money before I can get the goods; consequently I am short on many things before I can get an order from you and have to buy locally with no profit and I cannot keep the trade and be out of goods."

A Mr. Hughes, sent by defendant at about that time to look up the condition of the security, testified that he found a very dilapidated stock which he estimated worth $1,225, including fixtures.

About the first week in September, 1913, Forbes and his wife were in Grand Rapids, and called at the office of defendant, where they talked with Harry Rindge about their indebtedness. Mrs. Forbes testified that she asked him in regard to the policy on the stock whether "if anything should occur, we are protected as well as yourself. And he said, 'Yes,' the policy did so." This Rindge denied, and testified that their only talk about insurance was in regard to the policy which he secured on the real estate, and of which he had written them repeatedly urging them to pay the premium, which they had failed to do.

Forbes had one fire the latter part of September, 1913. The resulting loss on stock and building was adjusted by an adjuster named Shaw, who visited Chippewa Lake for that purpose. He testified that

when Forbes signed proofs of loss on the building he asked about proofs of loss on the stock, and Shaw told him he had no interest in that policy, which was issued to defendant; that he did not go into the back room, but looked over the stock in the store, which was light, and in his estimation worth at the outside between $600 and $700.

Early in November, 1913, Harry Rindge sent one of their salesmen to Chippewa Lake to investigate conditions there, as Forbes continued to be delinquent in his payments and allowed checks to go to protest. This salesman was at the store on November 2, 1913, and testified that on an examination of the stock on hand he estimated that it would not exceed $1,000, including fixtures. On the following day, November 3d, Mrs. Forbes took her children and drove to Big Rapids to visit relatives. About noon Forbes locked the store and went to the hotel for dinner. Not long thereafter a fire broke out in the store, destroying it and its contents. A week later Mr. Logie, one of the defendant firm, in company with Shaw, the insurance adjuster, called on Forbes for his inventory and books to endeavor to make adjustment on his stock and fixtures. Forbes opened his safe and took out an inventory taken 11 months previous at the instance of the attorney of plaintiff, then acting for the Judson Grocery Company, and some check books, stating that all his other books and invoices had been left out of the safe when he went to dinner and were destroyed by fire when the store burned. The adjuster then refused to enter upon an adjustment, and Forbes was later called before the insurance commissioner at Big Rapids, where he was examined in regard to the fire. He there claimed that he had over $1,700 worth of stock in the store, but in an endeavor to specify the goods and their values he was not able to total more than $974. Defendant put the matter in the hands of its attorney to try

and secure an adjustment of the loss under the policy of insurance it held on the stock of merchandise. He was at Chippewa Lake, and asked Forbes to furnish an itemized statement of the loss, which the latter replied he could not do because he had left everything out of the safe excepting the inventory. Later the attorney secured Forbes' testimony taken at the inquiry before the commissioner at Big Rapids, and with such other evidence as he could procure went over the matter with the adjuster, reaching a tentative adjustment of the loss in the fore part of December, but made no settlement then.

On November 20th plaintiff's attorney, then representing Forbes, wrote defendant that insurance on Forbes' stock was taken out in its name by mistake, and the adjuster refused to recognize Forbes in the matter, asserted the latter had an interest in the policy, and notified defendant not to cancel and surrender it "until Mr. Forbes has also received his money." On December 24th defendant's attorney wrote plaintiff's attorney that, as the loss had never been adjusted, they had taken up the matter and effected an adjustment for $737.38 on the fixtures and $950 on the stock; that Forbes owed the three creditors for whom defendant was trustee, and for whose benefit it had taken out the policy, $1,628.44, with interest, and, if Forbes would pay this indebtedness, defendant would turn over the policy to him, but, if he did not accept the proposal within a reasonable time, defendant would accept the amount of such adjustment from the insurance company. In reply to this plaintiff's attorney wrote that Forbes' loss was in excess of the amount of the policy, and the proposed adjustment was not acceptable.

Defendant ultimately adjusted the loss with the insurance company for $1,687.38, and this action was brought by Forbes' assignees to recover the differ-

ence between the amount of the policy and defendant's claim. The trial resulted in a verdict and judgment in favor of plaintiffs for $852.34. Upon the trial defendant's counsel moved for a directed verdict in its favor on various grounds, which was denied, and amongst numerous requests asked the court to charge as follows:

"(12) If you find that Mr. Shaw, the insurance adjuster, told Mr. Forbes on the 24th of September, when he adjusted the first loss on the stock, that his name was not mentioned in the policy, and he had no interest in it, then he is estopped from claiming that he was deceived by the representations made by Mr. Smedley that he was protected by the policy. * * *

"(15) If you find that Mr. Forbes knew that the insurance was not in his name, as Mr. Smedley had written him, and neglected to look after his own interest, then he is estopped from claiming that he had been deceived by the defendant and cannot recover."

Subsequently defendant moved for a new trial on various grounds, which was denied. The claimed errors were saved for review by proper objections and exceptions. Defendant's numerous assignments of error are grouped for argument, in substance, as follows:

Refusal to direct a verdict for defendant; want of authority to make the alleged contract to insure the stock in Forbes' interest; want of consideration for the alleged contract; violation of the iron safe clause; varying terms of written contract by oral testimony; refusal of the court to give defendant's twelfth and fifteenth requests to charge; denial of defendant's motion for a new trial on the grounds that the verdict is against the great weight of the evidence and against the just rights of the defendant.

When the incumbrance on Forbes' stock was increased from $1,000 to $1,407.75, on July 17, 1912, he was carrying $2,500 insurance on it. He was required by the mortgage to keep the mortgagee's interest in-

sured, "and in default thereof within ten days" it became lawful for the latter to effect such insurance at the expense of the mortgagor. This was done under the circumstances related on July 20th and the insurance which Forbes had previously placed canceled. Forbes and the attorney testify that, according to their agreement and understanding, the insurance to be effected by defendant was to be for the same amount and protect the interest of both parties as provided in that for which it was substituted. Whether intentionally or inadvertently, the somewhat peculiar policy issued to defendant guardedly refrains from disclosing the owner of the property insured. Forbes' name is not mentioned in it, as owner or otherwise, and it is nowhere stated that defendant is owner or mortgagee or has any insurable interest in the property. Manifestly Forbes was not a party to the contract of insurance, and the insurance company could, as it did, refuse to recognize him. His only claim and remedy, if any, was against defendant for breach of contract in failing to insure his interest also in the property as plaintiffs allege it promised to do through its then agent and attorney.

The trial court charged that the two possible questions for them to consider were whether there was any such contract to insure Forbes' interest as alleged, and, contingent on the jury so finding, the damages sustained by reason of defendant's failure to comply with the contract; that if there was no such authorized contract plaintiffs could not recover, and it was not sufficient to show that such agreement was made between Forbes and the attorney, but it must appear that the latter had authority to make such agreement, "or, if he had no such authority, then it must appear that defendant, or some one acting for it, afterwards consented to the agreement and took out the policy to protect his interest as well as their own."

In any aspect of the case we are of the opinion that the quoted portion of this charge was misleading. Plaintiffs base their claim on an alleged contract made with Forbes at Chippewa Lake in July, 1912, by defendant's authorized attorney that it would take out a policy of insurance which would protect Forbes' interest and a breach of that contract. At most, what is claimed to have been subsequently done or said by defendant sustaining that claim would be but evidence that the attorney was authorized to so contract. There is no evidence that defendant, or any one acting for it, afterwards consented to the agreement and took out a policy to protect Forbes' interest as well as their own. The grievance is that it neglected or refused to do so. Damages are claimed in this action because such a policy was not taken out. If the attorney was not authorized to make the contract when and as it is claimed he did, plaintiffs' case fails. Conceding as true Mrs. Forbes' testimony that in the fall of 1913 she asked Harry Rindge whether the policy protected them also if anything should occur, and he said that "the policy did so," which he denies, it could, at most, only sustain the claim that the original contract was known and authorized. Such an answer, if made, would in no sense operate of itself as a contract or create any binding obligation upon defendant. As claimed, it was but an erroneous answer to an inquiry as to an existing fact made without consideration.

If the contract as claimed was authoritatively made, defendant's contention that it was nevertheless conclusively and as a matter of law void in its entirety for want of consideration is not tenable. Forbes' stock and fixtures were then insured. An increase of the incumbrance upon them might, and apparently did, jeopardize this insurance, as the attorney suggested, and in the negotiations for increased security, protected by insurance for which Forbes was to pay,

procuring another policy similar and for the same amount could properly be made of mutual obligation and an inducing consideration of value, involving the interests of both parties. Neither was it necessarily void as changing the terms of a written contract by oral testimony, if as plaintiffs claim, the mortgage provided Forbes should keep the property insured, and if he failed to do so defendant could effect the insurance of its interest and hold him responsible for the premium. The alleged agreement is not contradictory of the mortgage, but an additional arrangement as to the manner of procuring the required insurance which it is claimed defendant undertook to do for Forbes at his expense.

Defendant was entitled to have its requests 12 and 15, or at least the substance of them, given to the jury. Shaw testified positively to telling Forbes in September that his name was not mentioned in this policy and he had no interest in it. Forbes claimed that he understood it was, and denied any recollection of Shaw advising him to the contrary. If he was in fact advised of the claimed breach of agreement by defendant to procure insurance for him a sufficient time before his last fire to have attended to it himself, it was his duty under the rule of avoidable consequences to do so, and in such case the measure of damages is not the loss resulting from a subsequent fire, but the value of the policy at the time the failure to insure is discovered. 2 Sedgwick on Damages (9th Ed.), § 623. In *Brant* v. *Gallup*, 111 Ill. 487 (53 Am. Rep. 638), which was an action for an alleged breach of an agreement to keep a building insured for a certain amount, the court approved an instruction in substance that, if the jury believed from the evidence that plaintiff had been informed a sufficient time before the fire that his building was inadequately insured, then it was his duty to have effected additional insurance, if he deemed

it necessary, and, failing to do so, he could not recover. The same rule as applied to life insurance was approved in *Grindle* v. *Express Co.*, 67 Me. 317 (24 Am. Rep. 31), and in its varied application has been recognized more than once by this court. *Haines* v. *Beach*, 90 Mich. 563 (51 N. W. 644) ; *Harrington-Wiard Co.* v. *Manufacturing Co.*, 166 Mich. 276 (131 N. W. 559) ; *Sauer* v. *Construction Co.* 179 Mich. 618 (146 N. W. 422).

Aside from the more technical questions raised, an examination of the testimony of the respective parties as to the stock and fixtures on hand and their value at or about the time of the fire impels the conviction that defendant's motion to set aside the verdict because against the great weight of evidence is of much force. The burden of proof rested upon plaintiffs to show by a preponderance of evidence that the insured property destroyed by the fire in question exceeded in value the amount defendant collected from the insurance company. Forbes and his wife are the primary parties in interest, and the only witnesses whose testimony tended to support the verdict. With the books and records by which their testimony might be tested destroyed, they testified to goods with values in excess of the amount of the policy. A year and a half before this trial, and but a comparatively short time after the fire, Forbes was examined before the insurance commissioner, and was only able to furnish a list of the goods constituting his stock valued by him at less than $1,000, which more nearly approximates the appraisal of three experienced men who examined his stock near the time of the fire. Young, the salesman sent by defendant to investigate conditions just before the fire, was accompanied by his father, who resided at Big Rapids. They drove over to Chippewa Lake together on Sunday, November 2d, and examined Forbes' stock with a view to determining its value.

The elder Young was a man familiar with inventorying general stocks, having 28 years' experience in mercantile business. He had been in Forbes' place of business on previous occasions, once the preceding fall. He testified that the stock had diminished by half since that time, described its condition, and estimated a fair value of what remained there that day as not to exceed $1,000 for stock and fixtures. A business man named Tice, experienced in running a country store, who had learned Forbes' stock was for sale and examined it that fall not long before the fire with a view to purchasing it, testified that in his opinion it was not worth over $500.

Mrs. Forbes, who assisted her husband in the store, but was absent at the time of the fire, testified along the same lines as her husband to the amount and value of the stock consumed by the fire, and also told of the attorney visiting Chippewa Lake in July, 1912, when he secured a larger mortgage, to which she asserts she "objected very much," and proposed instead to pay him $400 which they then had in bank, but he was not agreeable to the proposal, and said it would be better for them to put the money in stock. Her testimony is yet more difficult to reconcile with established facts. Recalled for further cross-examination by defendant as to this version of the transaction, the attorney testified that he would have brought back the $400 if given a chance, that he did not remember being told they wanted to pay instead of increasing the mortgage, and would have remembered it if proposed, stating, in substance, that an offer to him of $400 under the attending circumstances would have resulted in a fatal shock.

Forbes began business in 1909, renting the store, which he afterwards bought for $800, and the fixtures, consisting of showcases, counters, shelving, drawers, desks, safe, scales, ice box, etc., which he

used for two years, and then bought for $180. These he continued to use until the time of the fire, but testified that he added various articles; the principal ones mentioned being an oil tank, computing scales, cash register, second-hand soda fountain, and a roll-top desk purchased with tobacco bags, and tables made by local carpenters. The testimony is convincing that at the time of the fire his stock was broken, depleted, and his credit such that he had to pay in advance for stock purchased. Complaining of this to Mr. Stanton as early as June, he said he was short of many things on that account and had to buy locally with no profit. He had one fire in September, and knew something of adjusting losses. The fire of November 3d occurred at midday when the store was closed for business and locked, with all the bills, inventories, letters, books, and all records of his business out of the safe, except a favorable inventory taken 11 months before and his check book stubs, left in the closed safe.

We are constrained to conclude that, in the face of the abundance of contrary convincing evidence found in this record, direct and circumstantial, plaintiffs have not only failed to establish by a preponderance of evidence that the goods destroyed exceeded in value Forbes' indebtedness to defendant to the amount of the verdict, but that the same was so against the great weight of evidence as to require that it be set aside under applicable rules and reasons discussed in *Wierengo* v. *Insurance Co.*, 98 Mich. 621, 625 (57 N. W. 833); *Brassel* v. *Railway Co.*, 101 Mich. 5, 13 (59 N. W. 426); *Wheeler* v. *Jenison*, 120 Mich. 422, 429 (79 N. W. 643); *County of Montmorency* v. *Putnam*, 127 Mich. 36 (86 N. W. 398); *Baldwin* v. *Railway Co.*, 128 Mich. 417, 421 (87 N. W. 380); *Whipple* v. *Railroad Co.*, 130 Mich. 460, 462 (90 N. W. 287); *Cole* v. *Railway*, 132 Mich. 122 (92 N. W. 935); *Hintz* v. *Railroad Co.*, 132 Mich. 305, 310 (93 N. W. 634);

*County of Montmorency* v. *Putnam,* 135 Mich. 111 (97
N. W. 399); *Id.,* 144 Mich. 135 (107 N. W. 895);
*Sauer* v. *McClintic-Marshall Const'n Co.,* 179 Mich.
618, 629 (146 N. W. 422).

The judgment is therefore reversed, with costs and
a new trial granted.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE,
and BROOKE, JJ., concurred. PERSON, J., did not sit.