HARRINGTON–WIARD CO. v. BLOMSTROM MANUFACTUR-
ING CO.

1. NOVATION—CONTRACTS—ELEMENTS.
   The necessary elements of a novation are parties capable of
   contracting, a valid prior obligation to be displaced, the con-
   sent of all the parties to a substitution, based on sufficient
   consideration, the extinction of the old obligation, and the cre-
   ation of a new one, and these elements must be established
   by direct evidence or by evidence of such facts and circum-
   stances as logically lead to the conclusion that a new con-
   tract has been made.

2. SAME.
   Where defendant corporation transferred its assets to another
   corporation in part consideration of the assumption by the
   succeeding company of certain contracts with plaintiff,
   necessary elements of a novation were lacking in that plain-
   tiff was not a party to the contract of transfer and never
   agreed to any substitution of the new company or any other
   debtor.

3. SAME—PAYMENT OR PERFORMANCE OF CONTRACT.
   While it may not be essential that the assent to and acceptance
   of the terms of the novation be shown by express words to
   that effect, but may be implied from the facts and circum-
   stances attending the transaction and the conduct of the
   parties thereafter, the consent of the obligee is not infer-
   able merely from the performance of the original contract
   or the payment of money by the substitute.

4. SAME.
   And a novation is not to be implied from acts consistent with
   a continuing liability of the original obligor.

5. DAMAGES—PROFITS—CONTRACTS—EVIDENCE OF FACTS MITIGAT-
   ING LOSS.
   In an action for profits lost by virtue of breach of contract,
   defendant was entitled to show on cross-examination that
   plaintiff's loss was reduced by profits made under a contract
   with a third party during the time when plaintiff would
   have been engaged in carrying out the broken agreement.

6. SAME.
 It is the duty of an injured party to do all in his power to diminish damages suffered by breach of contract, and if he has an opportunity to protect himself from loss and does not do so he cannot be heard thereafter to complain.

7. SAME—VERDICT.
 Under a charge which permitted the jury to consider profits lost without deducting any profits made or which might have been made by plaintiff in mitigation of damages, the verdict will be held erroneous, although it was less in amount than plaintiff claimed.

8. TRIAL—PRACTICE.
 It is not a commendable practice to permit the stenographer to state his recollection of facts without referring to his notes.

Error to Wayne; Murfin, J. Submitted April 18, 1911. (Docket No. 102.) Decided June 2, 1911.

Assumpsit by the Harrington-Wiard Company against the Blomstrom Manufacturing Company for breach of a contract. Judgment for plaintiff. Defendant brings error. Reversed.

*John E. Moloney* (*Frank W. Atkinson,* of counsel), for appellant.

*Corliss, Leete & Joslyn,* for appellee.

STONE, J. This is an action of assumpsit brought to recover damages for the breach of two contracts made by the parties, as hereinafter stated.

On the 9th of April, 1908, the defendant was engaged in the manufacture of automobiles. It entered into contract with the plaintiff company, which was a contracting machinist. By and under the terms of this contract the plaintiff was to build and construct 25 two-cylinder Gyroscope motors for the defendant for the sum of $2,412.50. It was to furnish all the materials and workmanship for the engines, with the exception of crank shafts, connecting rods, valves, main ball bearings, forgings, steel castings

for steering device, intake and exhaust water pipes. The latter materials were to be furnished by the defendant, which was also to furnish all materials necessary for building jigs and tools, and to pay, in addition to the contract price, 60 cents per hour for the work done upon the jigs and tools. From time to time, as the work progressed, the defendant was to advance to the plaintiff sufficient moneys to meet its pay rolls upon this work. Ten motors were built and delivered under this contract, and considerable other work is claimed to have been done, and materials furnished towards completing the 15 additional motors. On or about the 24th day of July, 1908, the plaintiff was instructed to cease manufacturing any more motors under the contract of April 9, 1908. Under this first contract the plaintiff claimed the value of each item that was manufactured, embracing the cost of material and labor, to be $1,256.75, and damage by reason of defendant's failure to fulfill the contract in accordance with the terms thereof of $500 as reasonable profits on 15 motors not constructed.

On February 23, 1909, the second contract was made by the parties. Under the terms of this contract, the plaintiff was to manufacture for the defendant 300 small two-cylinder Gyroscope motors for the sum of $87 each, and deliver the engines as fast as completed and tested, and the defendant was to advance, from time to time, to the plaintiff, all pay rolls, and pay for all materials going into said engines when payment therefor should become due and payable. Fifty-two engines were delivered under this contract by the plaintiff to defendant. Some time in June, 1909, at the request of the defendant, the plaintiff suspended work under this contract. It was the claim that up to that time it had acquired a large quantity of material and expended a great amount of labor in manufacturing parts for the completion of the contract. Plaintiff's statement of this material and labor appears as an exhibit in the case. That exhibit contains a statement of labor and material required to construct 248 Gyroscope motors under

the last contract. It aggregates $8,214.82, with the additional item of $1,500 for loss sustained as damages by reason of the cancellation of the contract. The bill of particulars in the case contains these two items, respectively, of $500 and $1,500 as damages for loss of gains and profits under the two contracts. There was a credit to the defendant allowed upon the trial of $4,954.08 in excess of the engines actually delivered.

On or about the 31st of August, 1909, the defendant entered into an agreement with Fred Postal and Henry Bowen by and under the terms of which it agreed to sell to said last-named parties, and to a corporation which was to be organized by them and their associates, all of its assets for a consideration therein named, and the said Bowen and Postal agreed as follows:

" We will not assume any debts or obligations of your company, founded on contract or tort, except for materials not delivered and agency contracts for machines to be delivered, such contracts we are to assume and carry out."

On or about the 11th day of September, 1909, in accordance with the terms of this contract, said Postal and Bowen and their associates organized a corporation known as the " Lion Motor Car Company." Mr. Bowen was elected president and general manager of this corporation at that time. Pending the negotiations for the transfer of the property of the defendant, as above contemplated, the plaintiff threatened to institute proceedings to prevent the transfer. Between the 19th and 31st days of August the attorney for the defendant had an interview with the general manager and treasurer of the plaintiff and its attorney, when he informed them of the proposition that had been made by Bowen and Postal, and stated that, if the proposition was accepted, Bowen, Postal, and their associates, when organized into a corporation, were to assume all contracts for materials which the defendant had. At this interview it was stated that the plaintiff would not allow any transfer until its matters with the defendant had been settled and adjusted, and attachment pro-

ceedings were threatened. It was agreed that nothing should be done which would change the position of the plaintiff without notice to it. While these negotiations were pending, Mr. Wiard, the general manager and treasurer of the plaintiff, acting for it, was kept informed as to what was going on; and some time between the 1st and 10th of September, 1909, he was given a copy of the contract by the attorney of the defendant, who called Mr. Wiard's attention to the fact that under the terms of the agreement the two contracts between the parties to this suit would be assumed by the purchasers of the plant, and that, as soon as the corporation was organized, it was going to begin business at Adrian, and continue the manufacture of the products of the defendant. In these conversations Mr. Wiard stated to the attorney for the defendant that all the plaintiff wanted was to have these contracts carried out. He did not care whether this was done by the defendant, Mr. Postal, Mr. Bowen, or the Lion Motor Car Company.

On the 16th day of August, 1909, Mr. Blomstrom resigned the position which he held as superintendent and manager of the defendant. On the same day he entered into the employment of Messrs. Postal and Bowen, and, after the organization of the Lion Motor Car Company, became the superintendent of its plant at Adrian, Mich., and continued in that position down to the time of this suit.

On the 11th day of September, 1909, immediately following the adjournment of the meeting at which the Lion Motor Car Company was organized, Mr. Bowen, Mr. Blomstrom, and others interested in the new company went to the office of the attorney of the plaintiff. The attorney was there informed that the corporation known as the Lion Motor Car Company had been organized, and that it had taken over the contracts for materials of the defendant, and Mr. Bowen said that in a few days he would be down and have some money. On the 16th day of September Mr. Bowen gave his personal check to the

plaintiff for $2,000, and the following paper was executed:

"Memorandum of agreement made this 16th day of September, 1909, by and between Harrington-Wiard Company, a corporation in Detroit, Michigan, and Henry Bowen of Adrian, Michigan.

"Whereas, the said Harrington-Wiard Company hold a contract with the Blomstrom Manufacturing Company for the manufacture of motors, upon which has accrued accounts for material aggregating upwards of two thousand dollars ($2,000.00).

"And whereas, said Blomstrom Company has failed to advance funds required sufficient to meet said obligations and the funds are required to go on with said work under the contract:

"Now, therefore, said Henry Bowen, in consideration of the premises, hereby advances as a loan to said Harrington-Wiard Company two thousand dollars ($2,000.00) to enable said company to take up said pressing demands for material and to permit said Harrington-Wiard Co. to use said loan of two thousand dollars in connection with the fulfillment of the contract above mentioned, settlement therefor to be made in the final adjustment of said contract.

> "HARRINGTON–WIARD CO.
> "F. WIARD, Treas.
> "HENRY BOWEN."

Prior to the time this payment of $2,000 was made by Mr. Bowen to the plaintiff, neither Bowen, Postal, nor the Lion Motor Car Company had any business whatever with the plaintiff.

The defendant retired from active business operations on or about the 31st day of August, at the time of signing the contract with Bowen and Postal, above referred to.

On the 6th day of October, 1909, Mr. Wiard went to Adrian to the plant of the Lion Motor Car Company for the purpose of ascertaining when the plaintiff could proceed with these contracts. He was there notified both by Mr. Bowen and Mr. Blomstrom, who was then superintendent of the Lion Motor Car Company, that they were making some little changes in the engine, and that as

soon as these changes were completed they would proceed with carrying out the contracts. Mr. Wiard told Mr. Bowen that the plaintiff was rather hard up, and Mr. Bowen instructed the treasurer of the Lion Motor Car Company to give Mr. Wiard a check for $500, which he did. The $2,000 payment and the $500 payment were credited to the defendant's account on the books of the plaintiff.

After returning to Detroit, on or about the 11th day of November, 1909, Mr. Wiard claims that he ascertained that the Lion Motor Car Company was not having blueprints of changes made, and that he then concluded to put the matter into the hands of his attorney. About this time the plaintiff made up a statement which appears in this record as Exhibit 14. This statement was made out to the Lion Motor Car Company of Adrian, Mich., and purports to be a complete statement of all the claims of the plaintiff in this suit, together with all credits, including the $2,000 and $500 payments.

The Lion Motor Car Company gave no orders for engines, and in February, 1910, this suit was started. The main defense urged by defendant was that there had been a novation of these contracts in litigation.

We have not here attempted to make a full statement of all of the testimony relating to the claimed novation. We have, however, read the record with care. Upon the trial of the case some questions arose as to the admissibility of evidence bearing upon the subject of the plaintiff's claim for damages. In the direct examination of Mr. Wiard the following occurred:

"*Q*. You knew what the net profit of your company would be if it completed the contract in accordance with the terms thereof?

"*A*. We figure 25 per cent. I should say that was a fair estimate. That would give us a profit of $21.75 on each motor, and there were 248 motors yet to be delivered. In figuring $1,500 loss on this (the second) contract, I considered the loss of time, the loss of taking on other

contracts, lots of things as that, storage and handling the material and so forth.

"*The Court:* I don't think these other items are proper under the circumstances. * * *

"*Q.* Giving credit for the payments made upon this contract at the time the suit was commenced, on the second contract, what was the balance due your company? (Objected to as incompetent and immaterial. Objection overruled and exception.)

"*A.* That is $8,235.30. That includes the $1,500 loss under this contract, and is giving credit for all payments that have been made according to our books.

"*Defendant's Counsel:* He asked what the balance is. Now he is trying to put $1,500 as a prospective loss.

"*The Court:* Which I have stricken out. Why isn't this a great deal simpler? He has now detailed a claim. You can get the payments that have been made, and in that way strike your balance."

On cross-examination of the witness Wiard the following occurred:

"During the year 1908 we did very little work outside of the work of the Blomstrom Manufacturing Company while we were working on their contract. Our contracts gave our shop, while we were working on them and pushing them, practically full employment. We did take up other work in our shop in 1908. We took a contract from the Hupp Motor Car Company.

" *Q.* How much of a contract was your contract with the Hupp? (Plaintiff's counsel objected to this question as incompetent.)

" *The Court:* I sustain the objection. (Defendant excepts.)

"*A.* The contract which we took from the Hupp Motor Company in the fall of 1908 was not sufficient to keep our shop going in business.

" *Q.* Did you make another contract with Huppmobile in 1909?

" *Plaintiff's Attorney:* I object to that as immaterial

" *The Court:* There is no occasion for going into tha any further.

"*Mr. Moloney:* Then I would like to make my statement of what I intend to show. I simply offer to show by this witness on cross-examination that they made con-

tracts in 1909, and that those other contracts were such that they took up all of their time in the shop. That by reason of having another contract they did not suffer anything in loss of profits on our contracts, because they simply turned their men and machines over on the other contracts.

"*The Court:* In other words, it is your theory that they cannot do two things at the same time.

"*Mr. Moloney:* Exactly, it is the situation in which they were down there.

"*The Court:* I will exclude it. (Defendant's counsel excepts.)

"*A.* We did not have a contract with the Hupp in 1908; it was 1909.

"*The Court:* I don't care whether it was or not; I have excluded the inquiry."

The court refused to submit the question of novation to the jury, but did submit to the jury the question of breach of contract by the defendant and damages claimed by plaintiff. The court charged the jury upon the subject of damages as follows:

"The plaintiff would be entitled to recover: *First*, the amount of money in dollars and cents that the plaintiff has expended for the parts of these motors, and for the labor and material involved in those parts, which he has not been able to put into these motors, and turn over; that is to say, the parts which he still has on hand which he is prevented from using because the defendant, as he claims, had, if you so find, told him to stop making these motors, less, however, the value of those parts, whatever you find the value of those parts to be. * * * In addition to that item of damage which he is entitled to recover, he is entitled to recover whatever in dollars and cents you find would have been his profits on that job had he been able to complete the job."

After the jury had retired to consider their verdict, they returned into court, in the absence of counsel for both parties, and made the following inquiry:

"*The Foreman:* Your Honor, we want to get some information in regard to the contracts, as to the amount that they ask in each contract, or if they have got to be fetched in separate. That is what we want to get.

" *The Court:* They should be figured separately, but your verdict should be returned to the court as an entirety.

" *The Foreman:* Well, we would like to get the information of what the total damages asked for were.

" *The Court:* Well, now, that is a matter of the evidence that was detailed before you.

" *The Foreman:* There is some mix-up in the figures.

" *The Court:* I have not before me the figures, nor did I carry them in my head. Are the files still here?

" *The Clerk:* Yes.

" *The Court:* The claim for loss of profits on the first contract was $500, and the claim for loss of profits on the second contract was $1,500; but the figures for the alleged cost, or the alleged value of the work and materials that were on hand changed so many times, so many computations, that I have not got those before me. I thought one of your number took those figures down.

" *A Juror:* I have some figures, but there is some dispute.

" *The Foreman:* There is a dispute about it.

" *The Court:* Let me see it.

" *The Foreman:* Some claim that is on the second contract, and some says on the total. ( Hands paper to the court.)

" *A Juror:* $556.25 was on the first contract; on the second contract was $8,214. I don't think that that inincluded the loss.

" *The Court:* My recollection is that that figure there was the gross total claimed by the plaintiff.

" *The Foreman:* On everything?

" *The Court:* On everything. That was the total claimed.

" *The Foreman:* On everything, that included the $500?

" *The Court:* That included the $500 and $1,500. That was the maximum total claim.

" *The Foreman:* That is what we want to get.

" *The Court:* That is correct.

" *The Foreman:* Interest on top of that?

" *The Court:* No, that also included the interest as computed by counsel.

" *The Foreman:* Wasn't that cut down to $7,900 and something?

" *The Court:* Possibly, in order to be accurate, we bet-

ter get the statement. (The court asks the stenographer if he took down the statement of the counsel for plaintiff to the jury as to their total claim. The stenographer speaks to the court privately.)

"*The Court:* The stenographer tells me that he has taken his minutes back to his office, but that he has a very distinct recollection that the last claim made during the argument of counsel was that the total claim including interest and everything was 7,000 and some odd dollars. The details of that the stenographer does not have; but he says he recalls very distinctly that the last claim made by counsel during the course of the argument, figuring in everything that the plaintiff claimed, was 7,000 and some odd dollars.

"*The Foreman:* Then we have nothing to do with figuring the interest. That includes interest?

"*The Court:* That includes interest and everything else, yes."

The jury thereupon retired; the foreman saying, "We will be ready in about five minutes, and thereupon the jury returned a verdict in favor of the plaintiff for $4,851, upon which judgment was entered.

The defendant has brought the case here upon writ of error, and there are 28 assignments of error. The first 13 of these relate to rulings of the court upon the admission of evidence. The fourteenth to twenty-sixth assignments relate to the charge of the court. The twenty-seventh and twenty-eighth complain of the additional instructions by the court in the absence of counsel.

1. The principal argument of counsel upon both sides relates to the subject of novation. It is properly raised by assignments of error based upon the refusal of the court to charge as requested by the defendant. The defendant contends that the evidence establishes a novation of the contracts involved in the case, and that the Lion Motor Car Company assumed the liability, and that the plaintiff accepted the Lion Motor Car Company in place of, and released, the defendant from liability. It is a well-established rule that the necessary legal elements to establish novation are: (1) Parties capable of contract-

ing; (2) a valid prior obligation to be displaced; (3) the consent of all parties to the substitution, based upon sufficient consideration; and, (4) lastly, the extinction of the old obligation and the creation of a valid new one. All of these elements must be established by the evidence; not necessarily by direct evidence, but by evidence of such facts and circumstances as logically lead one to the conclusion that a new contract has been made.

It is the claim of the defendant that at least this question should have been submitted to the jury upon proper instructions, and that the court erred in refusing such submission. The decisions of this court upon the subject of novation are so numerous that citation of authority seems to be unnecessary. We will, however, refer to a few authorities: 29 Cyc. pp. 1130–1133; 21 Am. & Eng. Enc. Law (2d Ed.), p. 663; *Dean* v. *Ellis*, 108 Mich. 240 (65 N. W. 971); *Fuller, etc., Manfg. Co.* v. *Houseman*, 117 Mich. 553 (76 N. W. 77); *Martin* v. *Curtis*, 119 Mich. 169 (77 N. W. 690); *Piehl* v. *Piehl*, 138 Mich. 515 (101 N. W. 628).

In our opinion there are several indispensable elements wanting here, to establish the contract of novation:

(*a*) Plaintiff is not a party to the contract between Bowen and Postal and the defendant herein, even though Bowen and Postal assumed the contracts in question.

(*b*) There is no evidence whatever in the record that the plaintiff ever agreed to substitute either Bowen and Postal, or the Lion Motor Car Company, in the place and stead of the defendant.

To constitute novation the creditor must have consented to the discharge of the original debtor, and must have accepted the promise of the new debtor.

It is true that it has been held that it is not essential that the assent to, and the acceptance of, the terms of novation be shown by express words to that effect, but that the same may be implied from the facts and circumstances attending the transaction, and the conduct of the parties thereafter. Such consent, however, is not to be implied

merely from the performance of the contract or the payment of money by the substitute, for that might well consist with the continued liability of the original party. *Illinois Car & Equipment Co.* v. *Wagon Co.*, 112 Fed. 737, 50 C. C. A. 504.

The fact that the plaintiff accepted $2,000 from Bowen, and $500 from the Lion Motor Car Company, is perfectly consistent with the position of the plaintiff that the defendant was not discharged from its contract liability. One may accept money or performance of a contract from a third party without releasing the original obligor. In the case last above cited, the defendant, which had contracted to furnish plaintiff with iron required in its business, leased its mills to the second company, which agreed to fulfill defendant's contracts, including that with the plaintiff. In an action by plaintiff to recover for the breach of the contract, defendant pleaded a novation as a defense. It was held that the lease containing the agreement of the lessee was admissible in behalf of the defendant as a link in the chain of evidence to prove novation, but that its exclusion was harmless error, where there was no evidence showing any agreement on the part of plaintiff to accept the lessee and release defendant from the contract. Upon that branch of the case Jenkins, Circuit Judge, speaking for the court, said:

"The evidence treating the lease as before us is wholly insufficient to establish a novation. In *American Paper-Bag Co.* v. *Van Nortwick*, 3 C. C. A. 274, 52 Fed. 752, we had occasion to consider the principles upon which the doctrine of novation is founded, and we declared that assumption of liability is not novation, unless there concur the consent of the one party to accept the substitute in lieu of the other party to the original contract, and a discharge of the latter. There must be consent by the creditor to take the new debtor as his sole security and to extinguish the claim against the former debtor. *Butterfield* v. *Hartshorn*, 7 N. H. 345 (26 Am. Dec. 741). Such consent is not to be implied merely from the performance of the contract by the substitute, for that might well consist with the continued liability of the original

party; the substitute acting for that purpose in the capacity of agent for the original obligor. Nor does payment by the wagon company to the Southern Company prove a novation. The car company, by its lease to the Southern Company, had put it out of its power to perform the contract. It sought to protect itself by agreement with the lessee to make and deliver to the wagon company the undelivered part of the iron contracted. In no other way could the contract have been performed. The Southern Company was entitled to receive payment for the iron it should thus manufacture and deliver. Payment to the Southern Company does not prove consent by the wagon company to a discharge of the liability of the car company. There must be something more—some evidence speaking an agreement between the original parties to the contract to discharge the original obligor from liability and to accept the substitute. We fail to discover sufficient evidence in this record proving such agreement. There is no evidence that the car company ever sought to be released from its liability, or that the wagon company was ever asked to accept the Southern Company as a substitute. There is no direct evidence upon this point, or any evidence from which an agreement in that respect could be implied."

In our opinion the circuit judge did not err in refusing to submit the question of novation to the jury.

2. This brings us to consider the seventh assignment of error, which is to the effect that the court erred in sustaining plaintiff's objection to the question, "Did you make another contract with the Huppmobile in 1909?" propounded to witness Wiard on his cross-examination. This was objected to as immaterial. The objection was sustained and exception taken.

While there is some confusion in the record, it is very clear that the plaintiff sought to recover the sum of $1,500 as loss of profits under the second contract. This is made very clear, not only by the testimony of Mr. Wiard, but also by the charge and by the colloquy which occurred between the court and jury, when they came in for further instruction. The object of defendant's counsel as to his purpose in asking this question was made very clear in his

statement to the court in the language quoted above. This was proper cross-examination. It was competent and material to show upon cross-examination of this witness the terms of the contract with the Hupp Automobile Company. If that contract was such that it occupied the entire time, and force employed, of the plaintiff, and the profits therefrom were such that they would offset the loss of profits under the second contract with defendant, it had the right to show it, as bearing on the question of damages.

The doctrine is well settled that, when there has been a breach of contract, the injured party must do all in his power to diminish the damages suffered, or which he may suffer. If he has an opportunity to protect himself from loss and does not do so, he cannot be heard thereafter to complain. 13 Cyc. p. 72; *Chandler* v. *Allison*, 10 Mich. 460; *Hopkins* v. *Sanford*, 41 Mich. 243 (2 N. W. 39); *Dennis* v. *Huyck*, 48 Mich. 620 (12 N. W. 878, 42 Am. Rep. 479); *Talley* v. *Courter*, 93 Mich. 473 (53 N. W. 621); *Tradesman Co.* v. *Manufacturing Co.*, 147 Mich. 702 (111 N. W. 343, 112 N. W. 708).

It cannot be said, in view of the language of the court above referred to, that in computing damages the jury did not take into consideration the claimed loss of $1,500 on the second contract. It is no answer to say that the verdict was less than the claim of the plaintiff.

The jury, under the instruction of the court, had the right to consider the $1,500 as entering into the element of damages, and it will be presumed that they followed the court's instruction. We are constrained to say that the ruling of the court in excluding the offered evidence was reversible error.

3. By the twenty-fourth assignment of error defendant claims that, from the first part of the charge above quoted, the jury would naturally understand that the plaintiff could recover the value of the material and labor not furnished by it, because of the breach of the contract by defendant, but which plaintiff would have furnished if the

contracts had been carried out; and that this was erroneous in view of the further instruction quoted, as to loss of profits.

While this part of the charge is not very clear, we doubt if defendant's contention is correct, and doubt if the jury were misled by it. However, it does show that the question of the loss of profits was submitted to the jury, in connection with the claim of $1,500 damages under the second contract.

4. By the twenty-seventh and twenty-eighth assignments of error the course pursued by the court in its colloquy with the jury is complained of. The statement of claimed facts as resting in the recollection of the stenographer was at least questionable, and the practice is not to be commended. It would have taken some time to have read the testimony from the stenographer's notes to the jury; but it certainly would have been the better practice. We should hesitate to reverse the case upon this latter ground alone; but we refer to it in the interest of proper practice. We find no further reversible error in the record. Other questions are raised by counsel; but they are not likely to occur upon a new trial.

For the error pointed out the judgment is reversed and a new trial ordered.

MOORE, MCALVAY, BROOKE, and BLAIR, JJ., concurred.