*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

UNIVERSITY PEDIATRICIANS,

        Plaintiff-
        Counterdefendant/Appellant,

v

BOARD OF GOVERNORS OF WAYNE STATE
UNIVERSITY,

        Defendant-
        Counterplaintiff/Appellee.

UNPUBLISHED
February 7, 2019

No. 340977
Court of Claims
LC No. 17-000128-MK

Before: CAMERON, P.J., and BECKERING and RONAYNE KRAUSE, JJ.

PER CURIAM.

In this contract dispute, plaintiff, University Pediatricians (UP), appeals an order granting summary disposition to defendant, Board of Governors of Wayne State University, pursuant to MCR 2.116(C)(10). On appeal, plaintiff argues it established by clear and convincing evidence that defendant either waived or modified the agreement or that it was superseded by a later agreement with a third party. We disagree and therefore affirm.

## I. BACKGROUND

Wayne State University (WSU) has a School of Medicine, but it does not own or operate a hospital. Therefore, physicians who are appointed as faculty at the medical school provide teaching and clinical instruction for medical students at several hospitals in the area, primarily at the Detroit Medical Center. Over time, these physician-faculty members formed independent practice groups affiliated with the WSU School of Medicine that specialized in specific practice areas that aligned with the specialties of the various clinical departments of the School of Medicine.

Prior to 2003, the Dean of the medical school formulated a set of parameters called the "Dean's Guidelines" that the practice groups had to meet before they could be recognized as an official Clinical Service Group for WSU. Relevant to this case, the Dean's Guidelines set forth

the following four requirements: (1) if the clinical service groups created and/or amended their own organizational documents, the organizational documents were required to be consistent with the Guidelines; (2) the person serving as chairperson of the medical school's clinical department had to also serve as the clinical service group president unless the Dean agreed otherwise; (3) clinical service groups could only provide professional services at practice sites approved in advance by the Dean, could not enter into any contract with a health facility without prior approval of the Dean, and had to furnish the Dean with an annual report listing each practice site and contract entered into; and (4) each clinical service group had to remit to the WSU Fund for Medical Research and Education (FMRE) 8.7% of its net professional service collections realized from professional services furnished at all practice sites. The Dean's Guidelines also provided that in order to be appointed as an official clinical service group for WSU, each practice group was required to enter into an Implementation Agreement with WSU. Section 2.1 of the Dean's Guidelines states:

> 2.1 Implementation Agreements. A Practice Group secures appointment as a recognized Service Group by entering into an Implementation Agreement in a form approved by the Dean. Each such Implementation Agreement shall require that the Service group abide by these Guidelines and that it make the payments to FMRE . . . .

In accordance with this requirement, and in order for UP to become the recognized clinical service group at WSU for pediatrics, UP and WSU entered into an Implementation Agreement on or about July 8, 2003. In addition to recognizing UP as the official pediatric clinical service group for WSU, the Implementation Agreement included requirements identical to those of the Dean's Guidelines. Important to this case, the Implementation Agreement had a termination clause, an integration clause, and an anti-waiver clause. The termination clause states:

> **7.1 Term and Termination**. This Agreement and the designation of the Group as a recognized clinical service group . . . is effective as of the date of this Agreement and shall continue until this Agreement is terminated under this Section 7.1. **The University may terminate this Agreement with cause and without penalty upon not less than ninety (90) days' prior written notice to the Group. The Group or the University may terminate this Agreement with or without cause upon not less than one hundred eighty (180) days' prior written notice to the other**. [Emphasis added.]

The integration clause stated:

> **8.4 Entire Agreement**. This Agreement … is the complete agreement between the University and the Group with respect to recognition of the Group under the Guidelines and may be **modified only by a written instrument** executed by the University and the Group. [Emphasis added.]

Finally, the anti-waiver clause stated:

> **8.6**. **Waivers**. No part of this Agreement may be waived except by the written agreement of the University and the Group. Forbearance in any form from demanding performance is not a waiver of performance. Until complete performance under this Agreement, the party owed performance may invoke any remedy under this Agreement or under law, despite its past forbearance.

The Implementation Agreement is the only agreement to which UP and WSU are both signatories.

In 1999, WSU formed a private, non-profit corporation called the University Practice Group (UPG). According to the UP's verified complaint, WSU formed the UPG to serve as a "single group practice" by consolidating all of the WSU clinical service groups recognized by the WSU School of Medicine into one entity. The current, acting, or interim Dean of WSU's School of Medicine served as president and chairman of the board of directors of UPG.

Beginning in 2004, the Dean, acting in his dual role as Dean of the School of Medicine and President of UPG, asked that all of the clinical service groups agree to merge into UPG. According to UP, on July 5, 2006, the Dean, acting as President of UPG, requested that UP merge into UPG. In addition, the Dean attached a binding letter of intent stating that UP agreed to merge into UPG. However, UP did not wish to lose their autonomy by merging into UPG. Thus, UP, UPG, and WSU began discussions about other ways that UP could be associated with UPG. Several clinical service groups merged into UPG; however, UP did not. By a vote of 119 to 3, the UP members voted not to merge into UPG. Over the next few months, UP, UPG, and WSU continued to negotiate the possible merger of UP into UPG; however, the negotiations broke down. Eventually, UP and UPG agreed that UP would not merge into UPG but would become a newly created department of pediatrics within UPG through a contract with UPG. To this end, UP and UPG entered into a Memorandum of Agreement (MOA) dated October 18, 2006; it was a short, two-page temporary agreement designed to be in effect only until a more detailed and complete agreement could be executed. The MOA provided the following recitals:

> **WHEREAS**, It is the vision of the Dean of WSU, UPG and other service groups to form a Group Practice in order to better coordinate the educational, research, and clinical activities through the realization of economies of scale, access to needed resources, and implementation of an ambulatory care strategy;
>
> **WHEREAS**, UPG will become that unified Group Practice and will establish a Department of Pediatrics within the Group;
>
> **WHEREAS**, UP has considered the advantages and disadvantages of working with or becoming an integral part of the unified group practice; and
>
> **WHEREAS**, UP wishes to maintain a contractual relationship with UPG and its Department of Pediatrics and continue its clinical, teaching and research relationship with UPG and the Wayne State University School of Medicine through UPG without fully integrating into UPG;

-3-

**NOW THEREFORE**, UPG and UP agree as follows:

(1) **Participation with UPG**. UP agrees to participate with UPG's educational, research and clinical activities after the October 1 2006 formation date of the unified group through a contractual relationship and UPG desires to retain those clinical, teaching and research services through such contractual relationship.

(2) **Structure**. UP agrees to enter into a contractual arrangement with UPG whereby UP will by mutual agreement with UPG provide the clinical, teaching and research services for UPG, and UP would work with UPG to coordinate those mutually agreed upon services for those hospital, clinics and health systems with which UPG has a contractual relationship to provide such services.

The MOA continued the same requirement that UP pay 8.7% of its net professional service collections to the WSU fund. However, there were some significant differences in terms between the Implementation Agreement and the MOA. The MOA contained no requirement that the bylaws of UP be approved by the Dean. There was no requirement that the chair of the clinical department of the School of Medicine be the president of UP. And there was no requirement that UP only contract with hospitals approved by the Dean. In contrast, there was a provision stating that UP *could* contract with any other medical service facility: "UP, in general, will provide services through a subcontract agreement with UPG; however, UP may enter into direct agreements on its behalf with any hospital, clinic, health system or payer." The MOA stated that it was effective "until such time as a definitive agreement is reached between the parties."

The MOA was signed by Robert M. Mentzer, Jr., M.D., as chairperson of UPG, and Bonita Stanton, M.D., the then-president of UP. Mentzer was also the current dean of the WSU School of Medicine. The MOA was subsequently amended to extend the expiration date to July 31, 2007. Talks between UP, UPG, and WSU continued. There were draft Affiliation Agreements that included WSU as a party, along with UP and UPG, and contained signature lines for WSU. Eventually, UP and UPG entered into a formal Affiliation Agreement to replace the MOA, but WSU was not a signatory of the final draft. This final version of the Affiliation Agreement is signed by UP and by "UPG d/b/a Wayne State UPG." It provides in Section 1.1 that UP "shall be the exclusive provider of Professional Services for WSUPG." The Affiliation Agreement also provided for the continued payment of 8.7% to the FMRE, but it did not require UP to adhere to the Dean's Guidelines and did not restrict who could be UP's president—two provisions contained in the Implementation Agreement. The Affiliation Agreement stated that it was effective as of January 1, 2008, and would continue in effect until June 30, 2010, unless otherwise terminated. Mentzer signed the Affiliation Agreement as chairman of UPG. Thereafter, UPG and UP entered into another Affiliation Agreement on December 8, 2014, which contained similar terms. The newest Affiliation Agreement provided that the term of the Agreement was to be one year commencing November 1, 2014, and would automatically renew for successive one-year terms. The Agreement was signed by Kenneth P. Lee, CPA, the executive director of UPG, and Steven Lipshultz, M.D., then president of UP. There was no signature line for a representative of WSU, and WSU was not a party to any of the executed Affiliation Agreements.

Other than requiring UP to adhere to the Dean's Guidelines, restricting UP's corporate governance, and restricting UP's ability to enter into contracts, the obligations of the 2014 Affiliation Agreement are "virtually identical" to the obligations imposed on UP under the Implementation Agreement. These include the obligation to provide teaching services to the WSU School of Medicine and its affiliated facilities like the Detroit Medical Center and Children's Hospital, the obligation to provide administrative services to the School of Medicine, and the obligation to pay 8.7% of net professional service collections to the FMRE.

On or about August 23, 2016, the Dean removed Lipshultz as chair of WSU's Department of Pediatrics and then demanded that he step down as UP's president, citing § 3.1B of the Implementation Agreement, which governs who may be Group President. Section 3.1B states: "The person serving as Chair, Interim Chair or Acting Chair of the clinical department of the School of Medicine in the Group's specialty shall also serve as the Group President unless the Dean agrees otherwise in writing." Dr. Lipshultz did not immediately step down, and he entered into an agreement on behalf of UP to provide physician services at Children's Hospital of Michigan. According to UP, this action was prompted in part because UPG had not reached an agreement with Children's Hospital on its own, and thus Children's Hospital was not paying UP, which was depriving UP of several million dollars in compensation.

On February 16, 2017, three physician-members of UP filed a derivative action on behalf of UP, seeking declaratory and injunctive relief against UP in the Wayne Circuit Court. They alleged that the members of the UP Board of Directors had breached their fiduciary duty by willfully ignoring their responsibilities to ensure that UP complied with the terms of the Implementation Agreement and in conducting the affairs of UP in a manner that was "oppressive to certain Members." Specifically, they claimed that the 2003 Implementation Agreement barred the current president of UP from leading the pediatrics department. Additionally, they alleged UP was not allowed to enter into any contract or affiliation with a health or educational facility, other than WSU, without the approval of the Dean.[1]

While the derivative action was pending in Wayne Circuit Court, UP filed the instant complaint in the Court of Claims on May 10, 2017, seeking a declaration that the Implementation Agreement was invalid because it was superseded and/or replaced by the MOA and later the Affiliation Agreement. UP averred that because WSU is a constitutional body politic, the issue of the invalidity of the Implementation Agreement could not be litigated in the Wayne Circuit Court action because WSU could not be made a party to that case. UP alleged that the Court of Claims had "exclusive jurisdiction" over WSU under MCL 600.6419(1)(a) and (b). UP requested that the Court of Claims declare that the Implementation Agreement was superseded and rescinded by the Affiliation Agreement; declare that UPG was substituted in

---

[1] UP has maintained that WSU used the plaintiffs in the derivative action as "straw men," convincing them to file the lawsuit by paying their legal fees. Moreover, UP argued that WSU ensured that the case was filed in Wayne Circuit Court, where WSU could avoid any potential negative ruling on the enforceability of the Implementation Agreement because the circuit court did not have jurisdiction over WSU in the derivative action against UP.

place of WSU by novation, and/or declare that WSU had waived its right to enforce the Implementation Agreement and the Dean's Guidelines against UP.

WSU filed a counterclaim in which it argued that the Implementation Agreement was not superseded by the Affiliation Agreement and that the Implementation Agreement was still valid and binding. It also alleged that UP had violated the Implementation Agreement by entering into the contract with Children's Hospital without WSU's approval, and by issuing employment agreements that did not require adherence to the Implementation Agreement. WSU requested that the Court of Claims: (1) enter an Order declaring that the Implementation Agreement was valid; (2) order that the Implementation Agreement had not been replaced or superseded; and (3) issue a preliminary injunction compelling UP to adhere to the Implementation Agreement.

Ultimately, the Court of Claims granted WSU's motion for summary disposition pursuant to MCR 2.116 (C)(10) and dismissed UP's Complaint. The court noted that UP had not offered any written agreement expressly demonstrating waiver, modification, or novation. In addition, the court concluded that UP had not shown the requisite mutual agreement to modify the Implementation Agreement under either an express contract theory or course-of-conduct theory. Noting that the party alleging a contract modification by course of conduct has a heightened standard of proof where a written-modification clause and/or an anti-waiver clause exists in the contract, the court concluded that UP had not established a modification, waiver, or novation of the Implementation Agreement by clear and convincing evidence. UP filed a motion for reconsideration, alleging that the court's ruling was premature because discovery, which had been requested, had not yet taken place. The court denied this motion.

## II. STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *Spiek v Dep't of Trans*, 456 Mich 331, 337; 572 NW2d 201 (1998). The moving party has the initial burden to support its claim by affidavits, depositions, admissions or other documentary evidence. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). The burden then shifts to the nonmoving party to demonstrate that a genuine issue of disputed fact exists for trial. *Id*. To meet this burden, the nonmoving party must present documentary evidence establishing the existence of a material fact, and the motion is properly granted if this burden is not satisfied. *Id*. In deciding such a motion, a trial court must consider the evidence in the light most favorable to the party opposing the motion. *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). If the record evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. *Id*. at 120.

The construction and interpretation of a contract is a question of law that is reviewed de novo. *Bandit Indus, Inc v Hobbs Int'l, Inc (After Remand),* 463 Mich 504, 511; 620 NW2d 531 (2001). In addition, the legal effect of a contractual provision is a question of law subject to de novo review. *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 366-367; 817 NW2d 504 (2012).

III.  ANALYSIS

A.  WAIVER AND/OR MODIFICATION OF IMPLEMENTATION AGREEMENT

UP first claims that through the course of conduct by WSU, UP, and UPG, WSU either waived or modified the Implementation Agreement, despite the Agreement's strict anti-waiver and modification clauses.  We disagree.

In *Quality Prods & Concepts Co v Nagel Precision, Inc*, 469 Mich 362; 666 NW2d 251 (2003), our Supreme Court recognized that parties have the right to modify their contracts even when a written anti-waiver or modification clause exists.  The Court held that the key is mutuality, stating:

> We hold that parties to a contract are free to *mutually* waive or modify their contract notwithstanding a written modification or anti-waiver clause because of the freedom to contract.  However, with or without restrictive amendment clauses, the principle of freedom to contract does not permit a party *unilaterally* to alter the original contract.  Accordingly, mutuality is the centerpiece to waiving or modifying a contract, just as mutuality is the centerpiece to forming any contract. [*Id*. at 364.]

In *Quality Products*, the plaintiff contracted to serve as a sales representative for the defendant.  *Id*. at 365.  The plaintiff would earn commissions on sales to customers in the plaintiff's designated sales territory.  *Id*.  The contract excluded sales to "machine tool suppliers," and it contained written anti-waiver and modification clauses.  *Id*.  The plaintiff allegedly breached the contract when he solicited sales from a machine tool supplier.  *Id*. at 356-366.  When the plaintiff later sought a commission from the sales, the defendant refused.  *Id*. at 366.  The parties attempted to negotiate an amendment of the contract to include payment of commissions for sales to machine tool suppliers, but they could not reach an agreement and, as a result, the parties' contractual relationship ended.  *Id*.  The plaintiff then filed suit for the commission, and the defendant moved for summary disposition based on the exclusion for sales to machine tool shops.  *Id*.  The circuit court granted the defendant's motion for summary disposition, but the Court of Appeals reversed and remanded the case back to the trial court.  *Id*. at 366-367.  The Supreme Court reversed the Court of Appeals and held:

> This mutuality requirement is satisfied where a waiver or modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to waive the terms of the original contract. [*Id*. at 364-365.]

The Court stated that "[u]pon proof of an express oral or written agreement, the mutuality requirement is clearly satisfied." *Id*. at 373.  However, the Court further held:

> [I]n situations where a party relies on a course of conduct to establish modification, mutual assent is less clear and thus the rescission, or waiver, of the original contract's terms is not so evident.  As a result, where course of conduct is the alleged basis for modification a waiver analysis is necessary.

As we have stated in other contexts, a waiver is a voluntary and intentional abandonment of a known right. This waiver principle is analytically relevant to a case in which a course of conduct is asserted as a basis for amendment of an existing contract because it supports the mutuality requirement. Stated otherwise, when a course of conduct establishes by clear and convincing evidence that a contracting party, relying on the terms of the prior contract, knowingly waived enforcement of those terms, the requirement of mutual agreement has been satisfied. [*Id*. at 373-374. (citations omitted.)]

The Court also stated:

In meeting this clear and convincing burden, a party advancing amendment must establish that the parties mutually intended to modify the particular original contract, including its restrictive amendment clauses such as written modification or anti-waiver clauses. [*Id*. at 373.]

The Court emphasized that there is a heightened requirement if a party relies on a "course of conduct" to establish modification, rather than a written or oral agreement:

In cases where a party relies on a course of conduct to establish waiver or modification, the law of waiver directs our inquiry and the significance of written modification and anti-waiver provisions regarding the parties' intent is increased. [*Id*. at 365.]

Thus, the party claiming waiver or modification must establish the same by clear and convincing evidence. Further, if the party seeking modification relies on a course of conduct, a waiver analysis is employed, and written-modification and anti-waiver provisions in the original contract are given heightened significance.

The Court stated that it is more difficult to prove a course-of-conduct theory where written modification and/or anti-waiver clauses exist in the original contract:

Further, whereas an original contract's written modification or anti-waiver clauses do not serve as barriers to subsequent modification by express mutual agreement, the significance of such clauses regarding the parties' intent to amend is heightened where a party relies on a course of conduct to establish modification. This is because such restrictive amendment clauses are an *express mutual statement* regarding the parties' expectations regarding amendments.

Accordingly, in assessing the intent of the parties where the intent to modify is not express, such restrictive amendment provisions are not necessarily dispositive, but are highly relevant in assessing a claim of amendment by course of conduct. Any clear and convincing evidence of conduct must overcome not only the substantive portions of the previous contract allegedly amended, but also the parties' express statements regarding their own ground rules for modification or waiver as reflected in any restrictive amendment clauses. [*Id*. at 374-375.]

The Court also stated that silence alone does not establish waiver. *Id*. at 365.

In the instant case, UP had to present evidence that WSU waived both the original Implementation Agreement and its anti-waiver provisions. UP did not do so. UP admits that there was no oral or express written waiver, and it relies on a "course of conduct" analysis in support of its claim. However, UP did not submit clear and convincing evidence of representations or affirmative conduct by WSU to show that WSU was intentionally and voluntarily relinquishing its right to enforce the Implementation Agreement. UP also did not submit clear and convincing evidence of representations or affirmative conduct by WSU to show that it was intentionally and voluntarily waiving the non-waiver provision of the Implementation Agreement.

As evidence, UP highlights the fact that WSU participated in the negotiations with regard to the MOA and Affiliation Agreement. UP also relies on the fact that WSU's name, and a signature line for WSU, was included on the drafts of the Affiliation Agreement but not in the final Affiliation Agreement between UP and UPG. However, the lack of a signature line undermines UP's position because it evidences the fact that WSU either never intended to have the Affiliation Agreement replace the rights and obligations set forth in the Implementation Agreement, or that WSU changed its mind during negotiations. Either way, this supports the position that WSU ultimately did not intend for the Affiliation Agreement to supersede the Implementation Agreement. Had WSU so intended, it would have been a party to the Affiliation Agreement. Furthermore, it is significant that WSU never formally terminated the Implementation Agreement even though there was a termination procedure set forth in § 7.1. UP also points to evidence that WSU was silent in the face of previous actions that UP took. On February 12, 2008, UP sent Mentzer a copy of the amended UP bylaws, which had been filed with the state on February 4, 2008, and to which WSU did not object. However, WSU's silence is not enough to establish waiver. *Id*. at 365. In all aspects, this case is controlled by *Quality Products* and it requires that summary disposition be affirmed.

UP points to the July 12, 2017 affidavit of Gary Lawera and avers that this "unrebutted affidavit is direct evidence of an express agreement." Lawera was the chief administrative officer and treasurer of UP from November 2002 through January 2008. He attested that he personally participated in the negotiations between UP, UPG, and WSU with regard to UP's possible merger into UPG and subsequent affiliation with UPG through the Affiliation Agreement. He confirms the allegations made in UP's Complaint and also states:

Pursuant to the parties' negotiations, the Memorandum of Agreement, and subsequently, the Affiliation Agreement, University Pediatricians, *Defendant* and University Group agreed that**:**

    a.  The Memorandum of Agreement and, subsequently, the Affiliation Agreement, replaced the Implementation Agreement and defined the obligations required of University Pediatricians to remain the pediatric clinical service group for Defendant's School of Medicine; and

    b.  University Physician Group *was substituted for Defendant* as the party responsible for administering the obligations of University Pediatricians to remain the pediatric clinical service group for Defendant's School of Medicine. [Emphasis added.]

-9-

However, these statements do not set forth facts supporting the allegations in the complaint; rather, they state conclusions only. MCR 2.119(B) states in pertinent part:

(1) If an affidavit is filed in support of or in opposition to a motion, it must:

. . .

(b) state with particularity *facts* admissible as evidence establishing or denying the grounds stated in the motion[. (Emphasis added).]

In *SSC Assocs Ltd Partnership* v *General Retirement Sys*, 192 Mich App 360, 363-364; 480 NW2d 275 (1991), this Court stated:

The affidavits must be made on the basis of personal knowledge and must set forth with particularity such facts as would be admissible as evidence to establish or deny the grounds stated in the motion. They do not resolve issues of fact. Their purpose is to help the court determine whether an issue of fact exists. Opinions, conclusionary denials, unsworn averments, and inadmissible hearsay do not satisfy the court rule. [Citations omitted.]

In *SSC Assocs*, the plaintiff executed a mortgage note for $5,500,000 payable to the defendant, and two years later, it prepaid the note, having determined that the amount owed was $6,007,910. *Id*. at 362. The plaintiff filed suit for breach of contract seeking a partial refund, alleging that the defendant miscalculated the interest due and that a lesser amount was due. *Id*. The note provided, in pertinent part:

Minimum Interest Return. Notwithstanding anything to the contrary contained in this Note, the total amount of interest to be paid by Maker to Payee shall not be less than an amount sufficient to pay to Payee an internal rate of return of fourteen and one half (14½%) percent per annum, as calculated by Payee, on the Principal Balance. [*Id*.]

The parties disagreed on whether the interest rate was actually 14.5% or 15.5%. *Id*. The plaintiff submitted an affidavit from one of the partners in the plaintiff partnership, asserting that the partnership understood that upon prepayment, the city was entitled to be paid interest reflecting an internal rate of return of 14.5%. *Id*. at 365. This Court held that the affidavit did not support the plaintiff, stating:

This was a self-serving statement of opinion for which no factual support was offered. Because of Mr. Nyman's involvement in the partnership, his sworn statement is naturally suspect. Furthermore, his affidavit did not resolve the ambiguity. It merely reasserted plaintiff's version of the contract language. [*Id*.]

The Lawera affidavit suffers from the same deficiencies as the affidavit in *SSC Assocs*. The statements in the cited paragraph are conclusions, not facts. Furthermore, to the extent that there was any issue of fact, the affidavit did not resolve the ambiguity. It merely reasserted UP's version of the facts and sets forth the terms of the Affiliation Agreement.

-10-

Moreover, *Quinto* supports this conclusion. There, the plaintiff filed suit against her employer and her supervisor, alleging that the supervisor's actions in continually demeaning her in front of coworkers caused a hostile workplace. *Quinto*, 451 Mich at 363. Her affidavit stated, in part:

> 9.      My supervisor, John Kujawski, had continually harassed me by demeaning and humiliating me in front of fellow employees.
>
> 10.      His conduct included comments regarding my age, my sex, my national origin and my ability to speak English.
>
> 11.      That all of these incidents took place while I was at work. [*Id.* at 367.]

The Court held: "Plaintiff's affidavit did not satisfy her burden as the opposing party; rather, it constituted mere conclusory allegations and was devoid of detail. . . ." *Id*. at 371. Similarly, Lawera's affidavit states only that WSU, along with UP and UPG, "agreed that the [MOA] and subsequently, the Affiliation Agreement replaced the Implementation Agreement." This statement is conclusory only and does not cite evidence that allows for that conclusion. Lastly, UP argues on appeal that Lawera's "unrebutted affidavit is direct evidence of an express agreement." The mere fact that WSU failed to submit a rebutting affidavit does not elevate Lawera's affidavit to "direct evidence." Under the standard for summary disposition, affidavits may still be rebutted by non-affidavit evidence such as documentary evidence. MCR 2.116(G)(5).

## B. NOVATION

UP also claims that the Affiliation Agreement superseded the Implementation Agreement by virtue of the doctrine of novation. As support, UP relies on WSU's course of conduct. We disagree.

The elements necessary to establish novation are: (1) parties capable of contracting; (2) a valid prior obligation to be displaced; (3) the consent of all parties to the substitution, based upon sufficient consideration; and (4) the extinction of the old obligation and the creation of a valid new one. *George Realty Co v Gulf Refining Co*, 275 Mich 442, 447-448; 266 NW 411 (1936); *Harrington-Wiard Co v Blomstrom Mfg Co,* 166 Mich 276, 286-287; 131 NW 559 (1911); *In re Dissolution of F Yeager Bridge & Culvert Co*, 150 Mich App 386, 410; 389 NW2d 99 (1986). While it is not essential that novation be shown by express words, and may be implied from the facts and circumstances attending the transactions and the conduct of the parties thereafter, such consent is not to be implied merely from the performance of the contract or the payment of money by the substitute. *Harrington-Wiard Co*, 166 Mich at 287. The evidence must be of "such facts and circumstances as logically leads one to the conclusion that a new contract has been made." *Id*. at 287.

UP relies primarily on WSU's participation in the negotiations for the MOA and subsequent Affiliation Agreement, the documents produced in the negotiations, and the Affiliation Agreement itself, along with WSU's failure to protest when UP's bylaws were changed in a manner not in conformance with the Implementation Agreement and the Dean's Guidelines. However, this evidence does not establish the third and fourth elements of the

-11-

doctrine of novation. The facts do not show that WSU consented to replacing the Implementation Agreement with the Affiliation Agreement or that the Implementation Agreement was extinguished. The evidence set forth by UP does not "logically lead[] one to the conclusion that a new contract has been made." *Id*. at 287.

This case is similar to *George Realty Co*, a case that also involved three parties in the alleged novation. *George Realty Co*, 275 Mich at 444. In that case, the plaintiff filed an action to recover rent due under a gas station lease that had been assigned several times. *Id*. at 446-447. In February 1929, the plaintiff, in return for rental payments, leased the station to Cadillac Petroleum. *Id*. at 444. In June 1920, Cadillac Petroleum assigned its interest in the lease to Paragon Refining Company of Michigan, with the plaintiff releasing Cadillac Petroleum. *Id*. On September 1, 1930, Paragon Refining then assigned its lease to the defendant, Gulf Refining Company. *Id*. In 1934, Gulf Refining Company assigned the lease to Robert McCausland. *Id*. at 444-445. Sometime later, the plaintiff brought an action for unpaid rent against Gulf Refining Company. *Id*. at 445. The plaintiff contended that the assignment of the lease from Paragon Refining Company to the Gulf Refining Company, accompanied by an assumption thereof by Gulf Refining Company, made Gulf directly liable to the plaintiff for the balance of the rent. *Id*. at 446-447. It contended that the legal effect of the documents executed, the assignments taken, and the occupation taken by Gulf Refining and the payment of rent directly to plaintiff after the occupation of the premises, constituted novation. *Id*. at 447. The Supreme Court concluded that consent of the plaintiff was lacking, stating:

> In order to create privity of contract in the case at *bar, there must have been a mutual agreement by the plaintiff, defendant, and Paragon Refining Company of Michigan,* and to establish this agreement plaintiff relied upon the agreement made September 1, 1930, between Paragon Refining Company . . . and defendant, wherein it provided, "Gulf Refining Company covenants and agrees that it will fully and completely perform from and after September 1, 1930, all leases and agreements and assignments of which it has or will accept from The Paragon Refining Company." *We do not think this clause in the agreement establishes plaintiff's theory as plaintiff company was not a party to it,* moreover, the agreement was made between the defendant company and the Paragon refining Company, of Ohio, while the lease in question was assigned to defendant company by the Paragon Refining Company of Michigan. *Id*. at 449 (emphasis added).

*George Realty Co* reinforces the theory that it is necessary for all three parties to mutually assent when there is allegedly a three-party novation. In this case, as in *George Realty*, WSU was not a party to the Affiliation Agreement and could not mutually assent to the terms of the contract. Reasonable minds could only conclude that novation did not occur, and therefore, summary disposition was properly granted to WSU.

## C. INCOMPLETE DISCOVERY

Next, UP claims that summary disposition was premature because formal discovery had not yet taken place. We disagree.

This Court reviews a trial court's decision to grant or deny discovery for an abuse of discretion. *Nuriel v Young Women's Christian Assoc*, 186 Mich App 141, 146; 463 NW2d 206 (1990). On July 14, 2017, UP issued First Discovery Requests upon WSU, as well as a Notice of Taking Records Deposition and a subpoena on UPG. The discovery primarily requested any and all notes, memorandums, correspondence, and any other documentation that these entities had pertaining to the various agreements entered into, the negotiations regarding UP's potential merger into UPG, and breaches of the various agreements. WSU and UPG did not respond to the requests. WSU filed a motion for immediate consideration along with its motion for summary disposition, arguing that in the interest of justice the motion should be heard as soon as possible, and that discovery should be put on hold until a ruling was issued on the motion. WSU also stated that UP had earlier agreed that a ruling on the motion for summary disposition should be expedited. UP did not file an answer or a brief in opposition to the motion for immediate consideration. UP followed with a motion to compel. The Court of Claims did not act on these discovery motions, concluding that they were moot.

Although summary disposition before the completion of discovery is generally considered premature, summary disposition may be allowed if further discovery does not stand a fair chance of uncovering factual support for the position of the party opposing the motion. *Bayn v Dep't of Natural Resources*, 202 Mich App 66, 70; 507 NW2d 746 (1993), citing *Prysak v R L Polk Co*, 193 Mich App 1, 11; 483 NW2d 629 (1992). Since UP did not file an answer or brief in opposition to the motion for immediate consideration, and therefore did not object to hearing the motion for summary disposition, we conclude that UP waived the issue. See *Reed Estate v Reed*, 293 Mich App 168, 176; 810 NW2d 284 (2011) (stating that "[t]he party alleged to have waived a right must have had both knowledge of the existing right and the intention of forgoing it") (quotation marks and citation omitted). The parties extensively briefed the issues in the summary disposition motion, there were more than 30 exhibits attached to the parties' briefs, and seven exhibits were attached to UP's complaint. Thus, despite having had ample time to object, UP failed to file any response to the motion for immediate consideration, or extensively brief the substantive issues, or attach supporting documentation. In light of the circumstances, there was ample time to develop the issues, and summary disposition was not premature.

Even if we were to entertain UP's claim that discovery was incomplete, there is no cause for reversal. In *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 292-293; 769 NW2d 234 (2009), this Court stated:

> Generally, summary disposition under MCR 2.116(C)(10) is premature if it is granted before discovery on a disputed issue is complete. However, the mere fact that the discovery period remains open does not automatically mean that the trial court's decision to grant summary disposition was untimely or otherwise inappropriate. The question is whether *further discovery stands a fair chance of uncovering factual support for the opposing party's position*. In addition, a party opposing summary disposition cannot simply state that summary disposition is

premature without identifying a disputed issue and supporting that issue with independent evidence. The party opposing summary disposition must offer the required *MCR 2.116(H) affidavits*, with the probable testimony to support its contentions. [Emphasis added.]

MCR 2.116(H) states in pertinent part:

(H) Affidavits Unavailable.

(1) A party may show by affidavit that the facts necessary to support the party's position cannot be presented because the facts are known only to persons whose affidavits the party cannot procure. The affidavit must:

(a) name these persons and state why their testimony cannot be procured, and

(b) state the nature of the probable testimony of these persons and the reason for the party's belief that these persons would testify to those facts.

(2) When this kind of affidavit is filed, the court *may* enter an appropriate order, including an order

(a) denying the motion, or

(b) allowing additional time to permit the affidavit to be supported by further affidavits, or by depositions, answers to interrogatories, or other discovery. [Emphasis added.]

On or about July 17, 2017, after WSU filed its motion for summary disposition, UP filed an affidavit sworn to by an attorney with UP's law firm, stating:

7. As of the date of this Affidavit, no discovery has been provided by Defendant in this action or in the Circuit Court Action, and issues of disputed material fact for trial exist and are likely to be further supported through discovery in this action.

8. Evidence that is uniquely in the hands of Defendant and likely to support Plaintiff's contention that Defendant agreed that the Implementation Agreement was replaced, superseded and rescinded, and UPG was substituted for Defendant—such as internal correspondence, memoranda and drafts of the Memorandum of Agreement and Affiliation Agreements—is unavailable to Plaintiff, as is an affidavit from Defendant itself.

We note that MCR 2.116(H)(2) uses the word "may." We agree with the court's decision not to hold the case open for discovery based on this affidavit. First, the affidavit does not state the name of particular persons and the "nature of the probable testimony" or the reasons for the affiant's belief that these persons would testify to those facts, as required by MCR 2.116(H)(2). It states only that "evidence that is uniquely in the hands of Defendant and likely to support

[UP's] contention" is unavailable to UP. Even if the court rule is read broadly so as to include documents in addition to actual persons' testimonies, the affiant did not state the reasons he believed any relevant documents existed. He merely stated that a request for documents had been served on WSU and was unanswered.

We also conclude that further discovery would not "stand[] a fair chance of uncovering factual support for the opposing party's position," as required by *Froling Trust*, 283 Mich App at 292. The lower court had already reviewed over 30 exhibits and concluded that UP's position was not supported by clear and convincing evidence. Additional notes and internal memos would not likely change the outcome. See, e.g., *Liparoto Constr, Inc v General Shale Brick, Inc*, 284 Mich App 25, 34; 772 NW2d 801 (2009) (where this Court held that summary disposition was proper even though discovery was not complete and further discovery would do nothing to change the outcome as to the clear and unambiguous language of the contract); see also *Village of Dimondale v Grable*, 240 Mich App 553, 567; 618 NW2d 23 (2000) (where additional discovery would not stand a fair chance of uncovering further facts for the defendant because it was unreasonable to expect that the IRS would send a notice of seizure to a property owner by both certified mail and personal delivery when only one method was required).

UP claims that this case is similar to *Bayn*, 202 Mich App 68, where the plaintiff filed an action following a slip and fall at a campground registration office of the state park operated by the defendant. The defendant filed a motion for summary disposition one month after the complaint was filed, both on the issue of whether the defendant had notice of the alleged defect and on the basis of governmental immunity, and the motion was granted at the hearing six weeks later. *Id*. at 68-69. At the hearing, the plaintiff argued that the defendant brought its motion before discovery had been completed, and she submitted an affidavit of a licensed architect who stated that he needed to view the site to determine whether there was a defect in the design or construction of the building's entrance. *Id*. at 69. This Court reversed the summary disposition order and ordered that the case be reheard based on the affidavit of the licensed architect. *Id*. at 72-73.

*Bayn* is distinguishable. Whether the plaintiff was entitled to recovery in that case depended upon whether there was a defect in the building and whether the defect was inherent in the building, in which case governmental immunity could bar her slip-and-fall claim. This could only be determined through expert opinion. In the instant case, there is no such issue for which the opinion of an expert witness is missing. The court reviewed numerous exhibits that had been amassed in this case and came to the conclusion that UP had not established by clear and convincing evidence that the Implementation Agreement had been waived, rescinded, superseded, or replaced by the Affiliation Agreement, either through a course of conduct or through novation. We see no error in the decision to deny further discovery.

Affirmed.

/s/ Thomas C. Cameron
/s/ Jane M. Beckering
/s/ Amy Ronayne Krause

-15-